UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MAGIC LINK GARMENT LTD,

    Plaintiff,

  v.

THIRDLOVE, INC.,

    Defendant.

Case No.  18-cv-07366-PJH

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF COUNTER-DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND SUMMARY JUDGMENT**

Re: Dkt. Nos. 79, 80, 81, 90

   Before the court is plaintiff counter-defendant Magic Link Garment Ltd.'s ("plaintiff") motion for summary judgment and partial summary judgment.  The matter is fully briefed and suitable for decision without oral argument.  Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby **GRANTS IN PART** and **DENIES IN PART** plaintiff's motion.

## BACKGROUND

   This action arises out of a commercial dispute between plaintiff and defendant counterclaimant ThirdLove, Inc. ("defendant").  Plaintiff is a Hong Kong-based contract manufacturer of women's intimate apparel with manufacturing facilities in China, Thailand, and Cambodia. Dkt. 81-1 ¶ 2.  Defendant is a San Francisco-based online retailer of women's intimate apparel.  Dkt. 22 ¶ 4.  The parties' dispute concerns multiple purchase orders for undergarment bras.

### A. Procedural Posture

   Plaintiff initiated this action in Massachusetts state court.  Dkt. 1-1.  On December 6, 2018, following the case's removal, the United States District Court for the District of

Massachusetts ("District of Massachusetts") transferred the action to this court.  Dkt. 31.

Plaintiff filed its operative first amended complaint ("FAC") on October 4, 2018.
Dkt. 9.  Defendant filed its answer and counterclaims ("Ans.") on November 1, 2018.  Dkt.
22.  Relevant to the instant motion, plaintiff previously acknowledged in its motion to
transfer before the District Court of Massachusetts that California law applies.  Dkt. 31 at
8.

On March 2, 2020, the parties filed a joint stipulation to mutually dismiss certain
claims and counterclaims. Dkt. 83 at 2-3.  Given that stipulation, the remaining claims in
plaintiff's operative First Amended Complaint are for the following:

- A claim for "breach of agreement," premised upon defendant's "failing to pay
  invoices for products that were shipped and delivered, wrongfully canceling
  products, and wrongfully deducting amounts from invoices."  FAC ¶ 21.

- A claim for violation of California Business and Professions Code § 17200
  premised upon defendant's purported effort to misappropriate plaintiff's trade
  secret information and interfere with its "relationships with its critical suppliers
  and vendors."  Id. ¶ 29.

The defendant's remaining counterclaims are for the following:

- Breach of contract, premised upon both the "delivery of products with quality
  and workmanship defects and its use of unauthorized third-party
  subcontractors to manufacture products for [defendant]." Ans. ¶¶ 16, 24-30.

- Breach of implied warranty of merchantability, premised upon the subject
  goods' "quality and manufacturing defects," particularly "splitting or otherwise
  coming apart," that "rendered them unfit for the ordinary purposes for which
  those goods were intended and used."  Id. ¶¶ 31-37.

On February 26, 2020, a few days before the parties' filed their stipulation mutually
dismissing certain claims, plaintiff filed the instant two-part motion for summary judgment
and partial summary judgment.  Dkt. 81.  The dismissed claims are irrelevant to the
instant motion.

2

United States District Court
Northern District of California

1   In the summary judgment portion of its motion, plaintiff challenges all of

2   defendant's remaining counterclaims. Id. at 5. In the partial summary judgment portion

3   of its motion, plaintiff contends that there is no triable issue as to certain elements that it

4   must show to substantiate (or facts that it will rely upon at trial to support) its claim for

5   breach of contract. Id. Rather than describe them here, the court specifies each of

6   plaintiff's four particular requests in its analysis below.

7   **B.    Factual Summary**

8   For brevity, the following provides only a summary of the parties' business

9   relationship and the transactions and their underlying events at issue in this litigation.

10   The court cites additional evidence or assertions as necessary in its analysis below.

11   **1.    The Parties Prior Business Arrangement**

12   Plaintiff and defendant have worked together since 2012. Dkt. 80-28 at 11.

13   Neither party contests that their business arrangements, including the transactions at

14   issue in this litigation, have been or are controlled by a master manufacturing agreement.

15   Instead, the ordinary course of their dealings involved defendant discussing with

16   plaintiff the development of a style of bra, the two would work together to develop the bra,

17   including preparing samples, and defendant would then place a purchase order with

18   plainitff. Ans. ¶¶ 10, 11; Dkt. 81-1 ¶ 5. Plaintiff asserts, and defendant does not

19   disagree, that the parties used this process in late December 2016 through January 2017

20   to develop the TL 50A plus size bras ("TL 50A bras," also referred to by the parties as the

21   "perfect coverage" bras) that are the focus of defendant's counterclaims. Dkt. 81 at 8;

22   Dkt. 84-6 at 175.

23   **2.    The Transactions At Issue**

24   The claims at issue in this motion all arise out of two dozen purchase orders

25   entered into by the parties. For analytical purposes, each order falls into only one of the

26   following three categories.

27   **a.    The Purchase Orders for the Shipped Bras**

28   The first category includes the following purchase order numbers: 411, 450, 556,

557, 560, 562, 563, 567, 576, 617, 618, 628 and 629.  Dkt. 80-3 (associated invoices).  This category of purchase orders includes those that defendant received bras under but admittedly did not pay for.  Dkt. 80-31 at 22.  The sum of the amount owed for the bras under these orders is $1,460,281.82.  Dkt. 81-1 ¶ 8.

For clarity, the court will refer to the bras provided under these purchase orders as the "shipped bras" and this category of purchase orders as the "shipped bras purchase orders."  These purchase orders provide the basis for plaintiff's breach of agreement claim and are the focus of its first request in its motion for partial summary judgment.  Dkt. 81 at 5.

### b.    The Purchase Orders for the Withheld Bras

The second category includes the following purchase order numbers: 570, 571, 624, 625, 632, 633, 545, 546, 630, and 631.  Dkt. 81-1 ¶¶ 12-14; Dkt. 81-3 (associated sale confirmations).  This category of purchase orders includes those that defendant placed to receive bras under, were set for shipping by fall 2018, but, following defendant's non-payment of the amounts owed for the shipped bras, plaintiff withheld.  Dkt. 81-1 ¶ 15.  The sum of the amount owed for the bras under these orders is $725,367.98.  Id. ¶ 14.

For clarity, the court will refer to the bras provided under these purchase orders as the "withheld bras" and this category of purchase orders as the "withheld bras purchase orders."  These purchase orders provide the basis for plaintiff's breach of agreement claim and are the focus of its second request for its motion for partial summary judgment.  Dkt. 81 at 5.[1]

### c.    The Purchase Order 542 Bras

The remaining category concerns only purchase order 542 ("PO 542").  The parties agree that PO 542 comprises 26 distinct shipments totaling 65,076 TL 50A bras

---

[1] Plaintiff's third request for its motion for partial summary judgment involves $51,565.05 in purported "finance charges" deducted by defendant without plaintiff's prior authorization.  Dkt. 81 at 5.

United States District Court
Northern District of California

(the "PO 542 bras") sent to and received by defendant at its designated FedEx facilities in Fontana, California and Greenwood, Indiana.  Dkt. 81 at 16; Dkt. 80-25 at 6-9.

While plaintiff usually manufactured defendant's goods at its China facility, the parties agreed that plaintiff could manufacture the PO 542 bras in its Cambodia facility. Neither party provided direct evidence of that agreement but both represent that fact in their briefing.  Dkt. 81 at 13; Dkt. 84 at 9. Plaintiff also asserted that defendant paid the full amount owed to it for the PO 542 bras, Dkt. 81 at 14, which, in its opposition, defendant did not contest, Dkt. 84 at 18-20.  That uncontested assertion is separately shown by defendant's discovery responses.  Dkt. 80-25 at 16 (listing "payments to Magic Link" for PO 542 bras quarantined or withheld from sale as a category of damages).

On or around June 20, 2018, defendant emailed plaintiff stating that it had identified "significant production quality issues" with the PO 542 bras then-received to date.  Dkt. 84-7 at 282.  Such purported issues included stains and a lack of general care.  Id.

On July 13, 2018, defendant instructed FedEx to "quarantine" the remaining four PO 542 shipments set for receipt on July 16, 2018 and July 17, 2018.  Dkt. 84-2 ¶ 2. Those shipments comprised 20,819 of the 65,076 PO 542 bras.  Id. ¶ 4.

In its discovery responses, defendant testified that it did not make any of those 20,819 bras available for sale, Dkt. 80-25 at 6-8, although plaintiff points out that defendant continued to sell TL 50A bras until at least August 26, 2018, Dkt. 80-30 at 10. In sum, defendant sold 39,960 of the 65,076 PO 542 bras and earned approximately $2,419,970 in revenues from such sales.  Dkt. 80-25 at 8.

The parties' dispute the source and extent of the purported defects in the PO 542 bras.  Defendant does not dispute, however, that, between April 2018 and early-May 2018, its independent reviewers, Bureau Veritas ("BV") reviewed three sample sets from the PO 542 production in Cambodia prior to their shipment.  Dkt. 81-9 (April 25, 2018 report); Dkt. 80-19 (May 8, 2018 report); Dkt. 80-20 (May 11, 2018 report).  The court details additional reviews of the PO 542 bras in its analysis below.

1  PO 542 provides the basis for defendant's breach of contract and breach of

2  implied warranty of merchantability counterclaims and is the focus of plaintiff's motion for

3  summary judgment on those claims.  Dkt. 81 at 5 (request no. 4).

### 3.    The Recently Discovered PO 542 Bras

5  A sub-issue in this litigation concerns the number of PO 542 bras that defendant

6  either quarantined, did not quarantine but did not sell, or otherwise identified as defective.

7  In its opposition, defendant proffered the declaration of a FedEx account manager, Jason

8  Trisoline, declaring that FedEx maintained 1,087 unopened boxes of approximately 20 TL

9  50A bras each from the final four PO 542 shipments, Dkt. 84-3 ¶ 7, which would amount

10  to 21,740 TL 50A bras.  He also declared that FedEx maintained an additional 3,075 TL

11  50A bras in its inventory.  Id. ¶ 8.

12  According to defendant, when combined with the 1,855 TL 50A bras that BV

13  purportedly found defective in its 100 percent inspections at the FedEx facilities in

14  Fontana and Greenwood in July 2018, Dkt. 84-6 at 224; Dkt. 84-6 at 245, the total

15  number of PO 542 bras either quarantined, remaining in inventory, or identified as

16  defective is 25,734.

17  Plaintiff contests the admissibility of this evidence as belatedly disclosed and

18  hearsay.  Plaintiff claims that defendant should be held to its purportedly prior

19  representation that only approximately 11,800 PO 542 bras remained in its possession.

20  Dkt. 88 at 11-13.  The court will, for purpose of this motion only, treat the total number of

21  remaining PO 542 bras as ***25,116*** (which is the difference between the 65,076 PO 542

22  bras undisputedly shipped and the 39,960 undisputedly sold).  As further addressed

23  below, whether the court should preclude defendant from offering evidence of the

24  approximately 13,000 "undisclosed" PO 542 bras is the proper subject of a pre-trial

25  motion in limine, not the instant motion for summary judgment

### 4.    The Parties' Relationship Deteriorates

27  By mid-July 2018, the parties appear to have mutually understood that their

28  business relationships had deteriorated.  On July 6, 2018, defendant indicated serious

United States District Court
Northern District of California

1   concerns with plaintiff's Cambodia facility TL 50A productions.  Dkt. 84-7 at 79.  On July

2   13, 2018, defendant instructed plaintiff to "stop production on all POs for TL 50A" bras

3   (including various purchase orders beyond PO 542, particularly POs 619, 620, 626, and

4   627).  Dkt. 84-7 at 268.  Significantly, as part of that instruction, defendant did not

5   indicate to plaintiff its decision to quarantine the final four shipments of the PO 542 bras.

6        Around that time, plaintiff reiterated its requests for payment of the $1,700,000

7   owed for the shipped bras.  Dkt. 81-1 ¶ 9. Defendant failed to respond to those requests.

8   Id. ¶ 11.  On August 17, 2018, plaintiff initiated this action on. Dkt. 1-1 at 17.

9                                        **DISCUSSION**

10  **A.    Legal Standard**

11       Summary judgment is proper where the pleadings, discovery, and affidavits show

12  that there is "no genuine dispute as to any material fact and the movant is entitled to

13  judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those which may

14  affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

15  (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a

16  reasonable jury to return a verdict for the nonmoving party.  Id.  "A 'scintilla of evidence,'

17  or evidence that is 'merely colorable' or 'not significantly probative,' is not sufficient to

18  present a genuine issue as to a material fact."  United Steelworkers of Am. v. Phelps

19  Dodge Corp., 865 F.2d 1539, 1542 (9th Cir. 1989).

20       Courts recognize two ways for a moving defendant to show the absence of a

21  genuine dispute of material fact: (1) proffer evidence affirmatively negating any element

22  of the challenged claim or (2) identify the absence of evidence necessary for plaintiff to

23  substantiate such claim. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102

24  (9th Cir. 2000) ("In order to carry its burden of production, the moving party must either

25  produce evidence negating an essential element of the nonmoving party's claim or

26  defense or show that the nonmoving party does not have enough evidence of an

27  essential element to carry its ultimate burden of persuasion at trial.").  Rule 56(c)(1)

28  expressly requires that, to show the existence or nonexistence of a disputed fact, a party

United States District Court
Northern District of California

1    must "cit[e] to particular parts of materials in the record." Fed. R. Civ. Pro. 56(c)(1).

2         The party moving for summary judgment bears the initial burden of identifying

3    those portions of the pleadings, discovery and affidavits which demonstrate the absence

4    of a genuine issue of material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986).

5    Where the moving party will have the burden of proof on an issue at trial, it must

6    affirmatively demonstrate that no reasonable trier of fact could find other than for the

7    moving party. However, on an issue for which the opposing party will have the burden of

8    proof at trial, the moving party need only point out "that there is an absence of evidence

9    to support the nonmoving party's case." Id. at 325; In re Brazier Forest Prod., Inc., 921

10    F.2d 221, 223 (9th Cir. 1990) ("[I]if the nonmoving party bears the burden of proof on an

11    issue at trial, the moving party need not produce affirmative evidence of an absence of

12    fact to satisfy its burden.  The moving party may simply point to the absence of evidence

13    to support the nonmoving party's case.  The nonmoving party must then make a sufficient

14    showing to establish the existence of all elements essential to their case on which they

15    will bear the burden of proof at trial.") (quoting Celotex Corp. at 322-23).

16         "Where a moving party carries its burden of production, the nonmoving party must

17    produce evidence to support its claim or defense." Friedman v. Live Nation Merch., Inc.,

18    833 F.3d 1180, 1188 (9th Cir. 2016) (internal citations omitted).  The court is only

19    concerned with disputes over material facts and "factual disputes that are irrelevant or

20    unnecessary will not be counted." Anderson, 477 U.S. at 248. It is not the task of the

21    court to scour the record in search of a genuine issue of triable fact. Keenan v. Allen, 91

22    F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying, with

23    reasonable particularity, the evidence that precludes summary judgment.  Id.

24         The court must view the evidence in the light most favorable to the nonmoving

25    party: if evidence produced by the moving party conflicts with evidence produced by the

26    nonmoving party, the judge must assume the truth of the evidence set forth by the

27    nonmoving party with respect to that fact. Tolan v. Cotton, 134 S. Ct. 1861, 1865 (2014);

28    Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999).  If the nonmoving party fails to

United States District Court
Northern District of California

8

1   produce evidence rebutting the moving party's initial showing, "the moving party is

2   entitled to judgment as a matter of law." Celotex Corp., 477 U.S. at 323.

3        Lastly, without granting summary judgment of an entire claim, courts may rely

4   upon Rule 56 to determine certain facts or elements of a claim as established and

5   thereby dispose of the need to adjudicate them at trial.   Lahoti v. VeriCheck, Inc., 586

6   F.3d 1190, 1202 n. 9 (9th Cir. 2009) (Citing with approval then-existing Rule 56(d)'s

7   advisory committee note that "[t]he partial summary judgment is merely a pretrial

8   adjudication that certain issues shall be deemed established for the trial of the case . . .

9   and likewise serves the purpose of speeding up litigation by eliminating before trial

10  matters wherein there is no genuine issue of fact.").

11  **B.     Analysis**

12       As an initial matter, the parties assume—without explanation in their pleadings or

13  briefing—that the Uniform Commercial Code ("UCC"), as codified under the California

14  Commercial Code, controls the breach of contract and implied warranty of

15  merchantability claims and counterclaims at issue here.  FAC ¶¶ 20-22; Ans. ¶¶ 24-37;

16  Dkt. 81 at 19 (citing California Commercial Code); Dkt. 84 at 15-16 (same).  Given that

17  California state law recognizes that the UCC applies to "transactions in goods," Cal.

18  Comm. Code § 2102, and "goods" are generally defined as "all things . . . which are

19  movable at the time of identification to the contract for sale," id. § 2105, the court

20  concludes that the UCC, as codified in the California Commercial Code and ***not*** common

21  law principles, control the claims in this litigation.

22       **1.     Partial Summary Judgment on Issues Presented in Plaintiff's Claims**

23       Apparently for the purpose of streamlining the issues necessary to prove its claims

24  at trial, plaintiff seeks partial summary judgment establishing the following four facts or

25  elements:

26   •   "There is no dispute of fact defendant failed to pay plaintiff for $1,460,281.82 in

27       products defendant accepted, received and sold to its customers."  Dkt. 81 at

28       5.  The bras subject to this request are the shipped bras delivered under POs

United States District Court
Northern District of California

411, 450, 556, 557, 560, 562, 563, 567, 576, 617, 618, 628, and 628.

- "There is no dispute of fact defendant deducted without authorization $51,565.05 in spurious "finance charges" from various invoices plaintiff issued to it." Id.

- "There is no dispute of fact defendant failed to provide assurances, adequate or otherwise, it would pay for $725,367.98 in other products plaintiff manufactured for it." Id.  The bras subject to this request are the withheld bras ordered under POs 570, 571, 624, 625, 632, 633, 545, 546, 630, and 631.

The court analyzes each request in turn.

### a.      Defendant Accepted the Shipped Bras

Here, there is no triable issue of fact that defendant accepted the shipped bras.  In its opening brief, plaintiff asserted with respect to the shipped bras that "[t]here can be no dispute [defendant] ordered, accepted, received and presumably sold products for which [plaintiff] issued invoices of almost $1.7 million," Dkt. 81 at 18, only $238,528.86 of which defendant actually paid for, id. at 8-9.  To support this assertion, plaintiff proffered the various invoices charged to defendant once the subject bras were shipped, Dkt. 80-4, and testimony that defendant failed to pay their amounts.  Dkt. 81-1 ¶ 8.  Defendant's own chief executive officer, David Spector, admitted that defendant did not pay any of the invoices associated with these goods.  Dkt. 80-31 at 22.

In its opposition, defendant failed to contest this assertion.  Instead, defendant argues that plaintiff is not entitled to partial summary judgment on its affirmative claim for the $1,460,281.82 owed for the shipped bras because plaintiff failed to address defendant's estoppel defense and also failed to show its own compliance with its "contractual obligations."  Dkt. 84 at 29.

Defendant misunderstands partial summary judgment.  As previously stated, partial summary judgment allows for the summary adjudication of a particular element or fact.  Here, plaintiff has proffered sufficient evidence to satisfy its initial burden that defendant accepted the shipped bras.  Defendant failed to cite any evidence putting such

United States District Court
Northern District of California

1 | acceptance at issue.  As a result, the court grants plaintiff's request for partial summary

2 | judgment as to the fact that defendant accepted the shipped bras worth $1,460,281.82

3 |     While that fact is now established, the court reminds the parties that it does not

4 | alter defendant's ability to nonetheless introduce evidence that would substantiate its

5 | purported estoppel affirmative defense at trial.

6 |     **b.**    **Defendant Deducted $51,565.05 from Various Payments Without**

7 | **Plaintiff's Authorization**

8 |     Here, there is no triable issue of fact that defendant deducted $51,565.05 in

9 | purported "finance charges" from various purchase orders without plaintiff's authorization.

10 | To support its request as to this fact, plaintiff proffered documentary evidence detailing

11 | the sum of the various deducted charges and testimony that plaintiff objected to

12 | defendant's deduction practices.  Dkt. 80-1 ¶¶ 19-20, Ex. F.  Plaintiff also pointed out

13 | that, aside from plaintiff's refusal to extend defendant "proper financing," defendant's own

14 | chief executive officer and Rule 30(b)(6) witness (for this issue) could not identify any

15 | contractual justification for these deductions.  Dkt. 80-31 at 12-14 (Q: "Was there any

16 | kind of agreement that ThirdLove entered into with Magic Link which allowed ThirdLove

17 | to deduct those amounts?" A: "I actually wouldn't know if we did have one.").

18 |     In its opposition, defendant failed to contest that it engaged in the conduct

19 | underlying plaintiff's request.  Instead, defendant again relies upon only its alleged

20 | estoppel affirmative defense to contest its non-liability for such conduct.  Dkt. 84 at 29

21 | ("[Plaintiff] argues that it is owed payments of $1.46 million on past due invoices for

22 | products accepted by [defendant] and $51,565.05 for what it terms improper finance

23 | charge deductions. But Magic Link ignores [defendant's] affirmative defense of estoppel

24 | and that Magic Link must demonstrate its own compliance with its contractual obligations

25 | to recover for any purported breach of contract by [defendant].").  As discussed

26 | immediately above, whether defendant's estoppel defense absolves it of liability for its

27 | unauthorized finance charges is a different issue than whether it actually levied such

28 | charges.  As a result, the court grants plaintiff's request for partial summary judgment as

United States District Court
Northern District of California

11

United States District Court
Northern District of California

to the fact that defendant deducted $51,565.05 from various invoices without plaintiff's authorization.

### c. There Is a Triable Issue of Fact Concerning Whether Defendant Failed to Provide Adequate Assurance That It Would Pay for the Withheld Bras

California Commercial Code § 2609 provides the following in relevant part:

> "(1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. *When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance* and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.
> (2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined *according to commercial standards*." Cal. Comm. Code § 2609(1)-(2) (emphases added).

"Whether in a specific case a buyer has reasonable grounds for insecurity is a question of fact. . . . Because the reasonableness of a party's insecurity is determined by commercial standards, there must be an objective factual basis for the insecurity, rather than a purely subjective fear that the party will not perform." In re Pac. Gas & Elec. Co., 271 B.R. 626, 640 (N.D. Cal. 2002). "While courts have on occasion determined the existence of reasonable grounds for insecurity as a matter of law, those decisions came in cases of bad faith or unequivocal facts." Id. 640 n.9.

Here, there is a triable issue of fact concerning whether defendant failed to provide adequate assurance of its due performance with respect to the withheld bras. Significantly, plaintiff failed to provide any evidence of the commercial standards used to determine both the reasonableness of plaintiff's insecurity as well as the adequacy of assurance required to justify plaintiff's conduct. In its opposition, defendant points out this evidentiary shortcoming, Dkt. 84 at 27, and, in its reply, plaintiff offers only a summary and rhetorical rebuttal, Dkt. 88 at 10-11 ("Magic Link therefore has established clear, objective grounds for insecurity. . . . What more insecurity must be required than a

1   buyer which has already received $1.7 million worth of product for which payment was

2   overdue, was over the credit limit the seller/creditor was willing to provide, and clearly

3   was refusing to communicate about payment?").

4         While the court understands plaintiff's position that because defendant failed to

5   provide **any** assurance it necessarily failed to provide "adequate" assurance, it remains

6   unclear to the court that a failure to respond to a request for a payment "update" within

7   six days, Dkt. 81-2 at 5, 7 (email chain showing plaintiff's July 25, 2018 request for "any

8   update news regard[ing] payment [sic]?" followed by its July 31, 2018 statement that "all

9   shipments have been hold [sic] until you clear outstanding payments"), falls short of what

10  the commercial standards require.  Absent evidence of such standards, the court cannot

11  conclude that defendant's failure to pay for the shipped bras or respond to plaintiff's

12  various requests for payment necessarily provides plaintiff a reasonable ground for

13  insecurity and serves as inadequate assurance within the meaning of § 2609.  As a

14  result, the court denies plaintiff's request for partial summary judgment as to the fact that

15  defendant failed to provide the assurance contemplated under § 2609.

16         **2.**      **Summary Judgment on Defendant's Counterclaims**

17         Separate from the partial summary judgment portion of its motion, plaintiff seeks

18  summary judgment on defendant's counterclaims for breach of contract and breach of the

19  implied warranty of merchantability.  On the basis of the evidence cited and proffered by

20  the parties,[2] the court analyzes each counterclaim in turn.

21

22

23  ─────────────

24  [2] Citing plaintiff's purportedly improper attempt to introduce new evidence on reply,
    defendant filed a motion to strike or, in the alternative, leave to file a sur-reply.  Dkt. 90.
    The court **DENIES** defendant's motion to strike.  The argument and evidence that plaintiff

25  advanced in its reply is reasonably related to plaintiff's initial argument in its opening brief
    that defendant accepted the PO 542 bras.  Moreover, as defendant itself acknowledges

26  in its sur-reply, the challenged evidence was a response to defendant's argument in its
    opposition that there exists a triable issue concerning its right to revoke its acceptance of

27  the PO 542 bras.  Dkt. 90-1 at 6.  To give defendant an opportunity to respond in the
    absence of oral argument, the court **GRANTS** its motion for leave to file a sur-reply (Dkt.

28  90-1).  The court also considered plaintiff's opposition and objection to defendant's
    motion (Dkt. 92).

United States District Court
Northern District of California

### a. Summary Judgment of the Breach of Contract Counterclaim Is Improper

Plaintiff seeks an order establishing that "[t]here is no dispute of fact defendant accepted 65,076 bras manufactured under purchase order no. 542 ('PO 542'), shipped the overwhelming majority to customers, collected payment from them, and cannot meet its burden to show the breach by [plaintiff] of any express warranty regarding them." Dkt. 81 at 5. Because plaintiff seeks an order summarily adjudicating the issue of its breach with respect to PO 542, the court will construe plaintiff's request as a motion for summary judgment of defendant's breach of contract counterclaim.

Plaintiff proffers the following two arguments in support of this request: (1) defendant irrevocably accepted the PO 542 bras and, as a result, may not sue for breach of contract in the first instance, Dkt. 81 at 20-23; and (2) defendant cannot satisfy its burden of showing systemic flaws in PO 542 and, to the extent any latent defects actually existed, defendant had the opportunity to identify them, id. at 23-26. The court addresses each argument below.

### i. Acceptance of the PO 542 Bras Does Not Necessarily Preclude Defendant's Breach of Contract Counterclaim

In its opening brief, plaintiff asserts that "once a buyer accepts the goods, it can no longer assert a breach of contract claim and is limited to asserting a claim for breach of warranty." Dkt. 81 at 22. In support of that purported rule, plaintiff cites only a single Central District of California case, Tabletop Media, LLC v. Citizen Sys. of Am. Corp., 2017 WL 10591885, at *7 (C.D. Cal. Mar. 3, 2017).

Contrary to plaintiff's statement, the court in Tabletop Media did not set forth such a rule. Rather, the court in Tabletop Media merely considered an argument in favor of it, id. at *7 ("Tabletop's second claim is for breach of contract. . . . *Citizen asserts that* Tabletop's breach of contract allegations are deficient because (1) under the Uniform Commercial Code ('UCC'), Tabletop 'accepted' the printers and did not 'revoke' its acceptance, so Tabletop is limited to a cause of action for breach of warranty, not a

United States District Court
Northern District of California

1 cause of action for breach of contract") (emphasis added), and then rejected it, id. at *10

2 ("The Court DENIES Citizen's motion to the extent it alleged that Tabletop could not

3 assert both a breach of contract and breach of implied warranty claim, or to the extent it

4 argued that Tabletop had not alleged sufficient facts to plausibly state that Tabletop

5 revoked acceptance of the printers."). In fact, the court in Tabletop Media expressly

6 recognized that "[i]f the buyer has accepted the goods, the buyer must allege that it

7 'justifiably revoked acceptance of the goods if it is to state a claim for breach of contract

8 under the UCC and earn an entitlement to breach of contract remedies under § 2711." Id.

9 (citing Cal. Comm. Code § 2711(1)).[3]

10        As a result, regardless of whether defendant accepted any of the PO 542

11 products, the court concludes that defendant may nonetheless pursue a breach of

12 contract counterclaim on the basis of such products if it revoked its acceptance of them.

13              **ii.        Defendant Irrevocably Accepted Some But Not All of the**

14                          **65,076 PO 542 Bras**

15        California Commercial Code § 2606(1) provides that "[a]cceptance of goods

16 occurs when the buyer . . .

17              (a) After a reasonable opportunity to inspect the goods
                signifies to the seller that the goods are conforming or that he
18              will take or retain them in spite of their nonconformity; or
                (b) Fails to make an effective rejection (subdivision (1) of
19              Section 2602), but such acceptance does not occur until the
                buyer has had a reasonable opportunity to inspect them; or
20              (c) Does any act inconsistent with the seller's ownership; but if
                such act is wrongful as against the seller it is an acceptance
21              only if ratified by him." Cal. Comm. Code § 2606(1).

22        Relatedly, California Commercial Code § 2608(1) provides that a buyer may

23 revoke his acceptance of goods "whose nonconformity substantially impairs its value to

24 him if he has accepted it . . .

25

26 _____

[3] Even if the court Tabletop Media did impose such a rule, plaintiff fails to identify any
27 basis in California decisional or statutory law for limiting a purchaser's defective products
related action to a breach of implied warranty claim in the event such buyer "accepted"
28 the subject goods.

(a) On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or
(b) Without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances." Cal. Comm. Code § 2608.

Under § 2608(2), "revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it." Cal. Comm. Code § 2608(2).

### 1.      Defendant Irrevocably Accepted the 39,960 PO 542 Bras It Sold to Customers

In its opening brief, plaintiff proffered evidence showing that defendant admitted to selling customers 39,960 of the 65,076 TL 50A bras and receiving over $2,400,000 in revenue from such sales.  Dkt. 80-25 at 6-8. Defendant failed to contest or otherwise address this admission in its opposition.  Dkt. 84 at 18-20. Because defendant's sale of this subset of the PO 542 bras is necessarily inconsistent with plaintiff's ownership of them, the court finds that defendant accepted them within the meaning of § 2606. Further, except for the complaints concerning defects in the approximately 200 or so TL 50A bras sold to customers (noted below), defendant failed to expressly identify any evidence showing that any non-conformity in that subset substantially impaired their value.  Given that, there is no triable issue that defendant irrevocably accepted the 39,960 PO 542 bras sold to customers.

In its review of the evidence, the court identified in defendant's supplemental interrogatory responses that it had "received returns or requests for exchange on 13,606" PO 542 bras shipped to customers, which required defendant to provide approximately $456,219 in refunds.  Dkt. 80-25 at 8. In its opposition, defendant failed to address these returns or otherwise advance any argument that they created a triable issue about the revocability of defendant's acceptance of this subset of the PO 542 bras.  Given that, the court finds that defendant waived its right to make any such argument.  John-Charles v. California, 646 F.3d 1243, 1247 (9th Cir. 2011) ("[Petitioner] has failed to develop any

16

argument on this front, and thus has waived it.").

As a result, with respect to the subset of 39,960 PO 542 bras sold, the court grants plaintiff's request for summary judgment on defendant's breach of contract counterclaim.

### 2.    Defendant Accepted the Remaining 25,116 PO 542 Bras

Defendant unquestionably accepted the remaining 25,116 PO 542 bras.  However, unlike the 39,960 PO 542 bras that defendant sold to its customers, defendant's ongoing possession of the remaining 25,116 PO 542 bras itself is not necessarily inconsistent with plaintiff's ownership of those bras.  Given that, plaintiff must rely upon § 2606(1)(a)-(b) to establish defendant's acceptance of the 20,819 quarantined PO 542 bras and the non-quarantined, inventoried 4,297 PO 542 bras..

Both § 2606(1)(a) and § 2606(1)(b) require that defendant have a "reasonable opportunity to inspect" the subject goods.  Cal. Comm. Code § 2606(1)(a)-(b).  "What constitutes a reasonable opportunity is always a question of fact to be determined according to the reasonable man standard by the trier of fact, in this case a jury." Square Deal Mach. Co. v. Garrett Corp., 128 Cal. App. 2d 286, 291 (1954) (construing California Civil Code § 1767).  The court in Square Deal explained that a buyer's right to a reasonable opportunity to inspect includes "a reasonable time within which to make it," and that "what is reasonable" depends "upon the circumstances of each case, the situation of the goods, [and] the nature of the business and the customs of the trade."  Id.

Here, the evidence undisputedly shows that defendant, through its relationship with FedEx, has maintained possession over the remaining 25,116 PO 542 bras since July 18, 2018 or earlier.  Whatever a "reasonable opportunity" to inspect those bras may require, such opportunity is plainly satisfied here because, as an incident to its possession, defendant had the ability to conduct an inspection for almost one month before plaintiff initiated suit, over three months before filing its counterclaims, and nearly two years since the instant motion.

Moreover, noticeably absent from defendant's opposition is any evidence that,

1    prior to plaintiff's filing suit on August 17, 2018, defendant told plaintiff that it rejected the

2    final four PO 542 shipments or were holding their contents in "quarantine."  Dkt. 84 at 11.

3    Rather, defendant simply notes that it "instructed FedEx to quarantine upon receipt [the

4    remaining 20,189 PO 542 bras] rather than place into inventory," id., and—with nothing

5    more than a vague cross-reference to "pp. 6-9" its opposition—asserts that it "notified

6    [plaintiff] of the defects immediately after they were discovered, informed [plaintiff] that

7    defective products were not acceptable, conducted inspections to identify and separate

8    out defective products and, eventually, decided to no longer sell the products," id.

9         However, no pre-litigation communication between the parties (or pre-answer

10   communication, for that matter) cited in defendant's vague cross-reference shows that

11   defendant told plaintiff that it was quarantining the remaining PO 542 products upon

12   receipt or otherwise rejecting them.  Dkt. 84 at 11-14.  Defendant's single sentence

13   statement that "[o]n July 13, 2018, [defendant] instructed [plaintiff] to cease production of

14   the TL 50A bras and that the TL 50A products *in Cambodia* should not be shipped," Dkt.

15   84 at 13-14 (emphasis added), misses the point because that instruction does not refer to

16   the PO 542 bras that arrived on July 16, 2018 and July 17, 2018, the acceptance of

17   which is at issue here.

18        Absent any evidence that defendant timely communicated its rejection of the

19   remaining PO 542 bras, Cal. Comm. Code § 2602(1), defendant's apparent failure to do

20   so—coupled with its full payment for the PO 542 bras, Dkt. 80-25 at 16 (listing "payments

21   to Magic Link" for PO 542 bras quarantined or withheld from sale as a category of

22   damages), and ongoing undisputed possession, Dkt. 81 at 21—unquestionably

23   establishes that it accepted the remaining 25,116 PO 542 bras within the meaning of §

24   2606.  The question then becomes whether such acceptance was revoked within the

25   meaning of § 2608.

26

27

28

### 3.     There Is a Triable Issue on Whether Defendant Revoked Its Acceptance of the Remaining 25,116 PO 542 Bras

Unlike defendant's failure to timely reject the remaining 25,116 PO 542 bras upon their delivery, Cal. Comm. Code § 2602 (tying timely rejection to the time of delivery), a reasonable jury could find that defendant timely communicated its revocation of its acceptance of those bras through its November 1, 2018 counterclaim, Cal. Comm. Code § 2608(2) (tying timely revocation to when the defects were or should have been discovered).  The remaining question is whether there is a triable issue concerning the substantial impairment of the quarantined or unsold 25,116 PO 542 bras.

The court concludes that there is.  Significantly, defendant proffered sufficient evidence supporting a triable issue of whether the PO 542 bras manufactured at plaintiff's Cambodia facility were generally defective.  First, defendant presented evidence of over 200 customer complaints about bras with ripped centers.  Dkt. 84-7 at 300-03 (defendant employee testimony authenticating 47-page spreadsheet detailing complaints re TL 50A bras); Dkt. 84-7 at 208-55 (47-page spreadsheet).

Second, defendant also proffered two reports by BV, dated July 10, 2018, Dkt. 84-6 at 221-241 and July 2, 2018, Dkt. 84-6 at 243-253, respectively showing the results of two "workmanship" inspections of the PO 542 bras in defendant's inventory at the FedEx Fontana and Greenwood facilities immediately prior to defendant's July 16, 2018 and July 17, 2018 receipt of the remaining 20,819 PO 542 bras.[4]  Significantly, the July 10, 2018

---

[4] Plaintiff objects to these reports as inadmissible hearsay.  Dkt. 88 at 15-16.  The court **OVERRULES** that objection because plaintiff failed to explain why defendant would not be able to proffer their contents in the form of live testimony by BV at trial.  JL Beverage Co., LLC v. Jim Beam Brands Co., 828 F.3d 1098, 1110 (9th Cir. 2016) ("We note, however, that at summary judgment a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony.").  To the extent plaintiff complains that consideration of these reports is inappropriate because "[defendant] denied to [plaintiff] the opportunity to review any of the units that BV looked at and which were not shipped to customers," Dkt. 88 at 16, such complaint is best addressed in pre-trial motion in limine.

1  report found that 564 of the 4,349 bras inspected at the Fontana facility had stains,

2  reflecting a 13 percent stain rate.  Dkt. 84-6 at 223.  This report further noted 559

3  "uneven gores" and a total of 1,574 "major defectives." Id. at 224.  The report also

4  attached 43 color photographs reflecting such purported defects.  Id. at 227-31.

5  Similarly, the July 2, 2018 report found that 154 of the 2,524 bras inspected at the

6  Greenwood facility had stains, reflecting a six percent stain rate.  Dkt. 84-6 at 244.  This

7  report further noted 45 "uneven gores" and a total of 331 "major defectives."  Id. at 245.

8  This report attached nine black and white photographs reflecting such purported defects,

9  Id. at 248.

10  Third, defendant's expert, Joyce Baran, opined that the PO 542 bras

11  manufactured at plaintiff's Cambodia facility, as opposed to its China counterpart, served

12  as the most important factor explaining the purported defects in the PO 542 bras.  Dkt.

13  84-4 at 19 ("Most importantly, Magic Link's construction of the TL50A bras manufactured

14  in Cambodia was significant factor in the center gore splitting. Magic Link placed the

15  underwire on top of the cup (instead of underneath the cup as customarily manufactured,

16  *and as Magic Link did on the TL50 and TL50A samples from China*), omitted back

17  tack and constructed inconsistent margins between 1/16 inch to 1/4 inch margins

18  seaming gore and cup. . .") (emphasis added).  The veracity of that explanation is

19  separately supported by plaintiff's own employee, Larry Chan, who, in a July 6, 2018

20  email, rhetorically admitted that that facility is a "shit hole."  Dkt. 84-7 at 200-01

21  ("[S]ounds like I am the only one [who] doesn't know what is going on in MLCB.  Why I

22  never see any inspection report or defective numbers from you guys?  How true is the BV

23  report?  How do you want me to reply?  *Admit our MLCB is a shit hole?*") (emphasis

24  added).

25  Internal documents apparently maintained by plaintiff's Cambodia personnel

26  substantiate that admission.  Defendant identified at least two internal quality control

27  records showing that such personnel identified defect rates in TL 50A bras manufactured

28  for non-PO 542 purchaser orders regularly above 5 percent and, in at least one instance,

United States District Court
Northern District of California

20

over 30 percent following a 100 percent "QC check."  Dkt. 84-7 at 142-167; Dkt. 84-7 at

125.  While evidence of aberrational defect rates in non-PO 542 TL 50A bras

manufactured in plaintiff's Cambodia facility does not directly show that the PO 542

production itself contained such high defect rates, it supports such an inference.

While plaintiff is correct that defendant's own admission that it failed to open the

shipments quarantined at the FedEx facilities in Greenwood undermines its ability to

claim that their bras are substantially impaired, Dkt. 88 at 15, the fact that all PO 542 bras

share a common source of manufacturing would allow a trier of fact to reasonably infer

that the same sort of defects found in the inspected or sold PO 542 bras existed in the

remaining 25,116 PO 542 bras (even if their boxes are unopened).  Again, such an

inference is further bolstered by the internal records concerning defect rates found in

plaintiff's Cambodia facility's non-PO 542 productions.

Lastly, in its reply, plaintiff cites the report of its expert, Glynn Raven, stating that

Raven found that his sample of the PO 542 bras were "good quality."  Dkt. 88 at 16 n.9.

However, as defendant responds in its reply, Raven's six-hour inspection amounted to a

roughly one minute per PO 542 inspection, Dkt. 90-1 at 7, and the purported flaws

identified by Baran, defendant's other expert (Wesley Gibson), and defendant's

employees call into question the accuracy or scope of his inspection, id. at 6-7.  While

plaintiff and its experts may offer a more persuasive explanation for any failures or the

absence of any defects in the remaining PO 542 bras, this motion is not the proper

vehicle for crediting such competing accounts.

In short, the court concludes defendant has proffered sufficient evidence to show a

triable issue concerning its revocation of its acceptance of the remaining PO 542 bras.

As a result, the court denies plaintiff's request for summary judgment of defendant's

breach of contract claim with respect to the remaining 25,116 PO 542 bras

### b.    Summary Judgment on Defendant's Breach of Implied Warranty of Merchantability Counterclaim Is Improper

Here, plaintiff proffers the following two arguments in support of its request for

summary judgment of defendant's breach of implied warranty counterclaim: (1) BV's April 2018 and May 2018 inspections of PO 542 bras could and should have revealed defects in the PO 542 bras and, as a result, no implied warranty may arise in the first instance, id. at 22; (2) defendant provided certain bra specifications amounting to an express warranty that displaced any purported implied warranty, id. at 22-23.  The court analyzes each argument in turn.

> **i.**     **BV's Pre-Shipment Reviews Do Not Preclude Any PO 542 Implied Warranty of Merchantability**

In its opening brief, plaintiff argues that "an implied warranty will not arise where an alleged defect could have been revealed upon a reasonably prudent examination of the product, and the buyer had reasonable opportunity to make such examination."  Dkt. 81 at 22.  In support of that position, plaintiff cites Guttman v. Nissin Foods (U.S.A.) Co, Inc., 2015 WL 4881073 (N.D. Cal. Aug. 14, 2015) and California Commercial Code § 2316(3)(b).  Plaintiff overstates the applicability of these authorities here.

California Commercial Code § 2316(3)(b) provides the following:

> "When the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him." Cal. Comm. Code § 2316(3)(b).

While plaintiff proffered evidence that BV conducted at least three sample set reviews at plaintiff's Cambodia facility prior to shipment of at least some of the PO 542 bras, Dkt. 81-9 (April 25, 2018 report); Dkt. 80-19 (May 8, 2018 report); Dkt. 80-20 (May 11, 2018 report), Comment 8 to § 2316's parallel UCC provision recognizes a distinction between an examination prior to an executed agreement and an inspection subsequent to such execution.  Cal. Comm. Code § 2316, UCC Cmt. 8 ("Under paragraph (b) of subsection (3) warranties may be excluded or modified by the circumstances where the buyer examines the goods or a sample or model of them before entering into the contract. 'Examination' as used in this paragraph is ***not synonymous with inspection***

*United States District Court*
*Northern District of California*

before acceptance *or at any other time after the contract has been made*.")
(emphases added).

Here, regardless of whether BV's sample set reviews qualify as "inspections" or
"examinations" (which the parties needlessly dispute at length), such reviews occurred
*after* the parties entered into PO 542 in December 2017. Dkt. 81 at 13 citing Ans. ¶ 13.
Plaintiff does not contest that PO 542 had been "entered into" at any other time.  Thus, §
2316(b)(3) does not preclude defendant's breach of implied warranty claim on the basis
of BV's reviews of PO 542.

Plaintiff's citation to the court in <u>Guttman</u> does not alter this conclusion.  The court
in <u>Guttman</u> dealt with a situation where the plaintiff "actually *did* inspect some product
labels to discern whether they contained [the claimed trans-fat defect]."  <u>Id.</u> at *2 (italics in
the original) (emphasis added).  Given that fact, to the extent plaintiff suggests that
<u>Guttman</u> stands for the proposition that an examination need only be available (*not*
actually conducted) to preclude a purchaser's breach of implied warranty claim, such
suggestion is unsupported.

Lastly, when questioning defendant's employee, Veronique Powell, plaintiff itself
characterized BV's Cambodia sample reviews as "initial inspections."  Dkt. 80-30 at 20
(Q: "What was the inspection strategy for the *initial i*nspections of PO 542? . . . . Q: "Are
you aware of any information given to Bureau Veritas to guide them in the inspections of
PO 542, the *initial* inspections?" . . . . Q: "Okay.  Are you aware of the results of the
*initial* inspections of PO 542 by BV?") (emphases added).  Such characterization
undermines the finality of defendant's right to further review any shipped goods and, in
any event, effectively admits that BV's sample reviews were not "examinations" (because
they were "inspections") within the meaning of § 2316.

Given the above, the court concludes that summary judgment of defendant's
breach of implied warranty counterclaim on the basis of plaintiff's first argument is
unwarranted.

ii.     The TL 50A Specifications Do Not Displace Any PO 542
Implied Warranty of Merchantability

In its opening brief, plaintiff argues that because defendant admits that it provided design specifications to plaintiff, Ans. ¶¶ 25, 32, defendant may not allege a claim for breach of implied warranty, Dkt. 81 at 22.  In support of that position, plaintiff cites Bancroft v. San Francisco Tool Co., 120 Cal. 228, 232 (1898), Carpenter Steel Co. v. Pellegrin, 46 Cal. Rptr. 502, 504 (Ct. App. 1965), and Comment 9 to California Commercial Code § 2316's parallel UCC provision.  Neither authority supports plaintiff's argument.

The court in Bancroft, a case from 1898, construed the then-existing California Civil Code § 1770, not the UCC provision now incorporated in the California Commercial Code.  120 Cal. at 231-32.  Defendant pointed out this distinction in its opposition, Dkt. 84 at 22, and plaintiff failed to offer any rebuttal in its reply.

Similarly, the court Carpenter relied upon then-existing California Civil Code § 1735 when rejecting plaintiff's implied warranty claim, not the sort of UCC provision at issue here.  46 Cal. Rptr. at 504.  Additionally, in its opposition, defendant pointed out that Carpenter dealt with a situation where the buyers claimed implied warranties that were inconsistent with the specifications provided, Dkt. 84 at 22, and plaintiff again failed to offer any rebuttal in its reply.

Lastly, the UCC comment relied upon by plaintiff does not support its position on this issue.  In relevant part, that comment provides the following:

> "The situation in which the buyer gives precise and complete specifications to the seller is not explicitly covered in this section . . . The warranty of merchantability in such a transaction, however, must be considered in connection with the next section on the cumulation and conflict of warranties. Under paragraph (c) of that section in case of such an inconsistency the implied warranty of merchantability is displaced by the express warranty that the goods will comply with the specifications. Thus, where the buyer gives detailed specifications as to the goods, neither of the implied warranties as to quality will normally apply to the transaction unless consistent with the specifications." Cal. Comm. Code § 2316, UCC Cmt. 9.

United States District Court
Northern District of California

1    California Commercial Code § 2317 provides that "[w]arranties whether express or

2    implied **shall be construed as consistent with each other and as cumulative**, but if

3    such construction is unreasonable the intention of the parties shall determine which

4    warranty is dominant. In ascertaining that intention the following rules apply: . . . (c)

5    **Express warranties displace [sic] inconsistent implied warranties** other than an

6    implied warranty of fitness for a particular purpose." Cal. Comm. Code § 2317 (emphases

7    added).

8         Plaintiff failed to explain how or why the design specifications commissioned by

9    defendant are inconsistent with the warranty of merchantability implied by California law.

10   Absent such explanation, such specifications do not bar defendant's claim for breach of

11   that warranty.  Thus, the court concludes that summary judgment of that claim on the

12   basis of plaintiff's second argument is unwarranted.  As a result, the court denies

13   plaintiff's motion for summary judgment of defendant's breach of implied warranty of

14   merchantability counterclaim.

15                  c.    **Partial Summary Judgment on Defendant's Prayer for Lost**

16                        **Profits Is Improper**

17   California Commercial Code § 2714(1) provides the following:

18            "Where the buyer has accepted goods and given notification
              [under § 2607(3)] he . . . may recover, as damages for any
19            nonconformity of tender, the loss resulting in the ordinary
              course of events from the seller's breach as determined in any
20            manner that is reasonable."  Cal. Comm. Code § 2714(1).

21        Here, the court concludes that defendant may assert a lost profits damages theory

22   when pursuing its counterclaims.  As established above, defendant accepted all 65,076

23   of the PO 542 bras.  Plaintiff failed to advance any argument establishing defendant's

24   inability to show notification under § 2607.  While neither party cites any California

25   authority on the issue, the court concludes that a lost profits theory qualifies as a

26   "reasonable manner" to measure a buyer's losses from a seller's breach in the sort of

27   retail commercial relationship here.  Significantly, the parties agree that defendant sold

28   39,960 of the PO 542 bras for a total revenue of over $2,400,000.  Given such sales, it is

1    reasonable to infer that, in the ordinary course of events, where defendant did not stop

2    offering the PO 542 bras to customers, defendant would have continued to make sales

3    and, presumably, profits.

4        Plaintiff's argument on this issue does not change that conclusion.  In its opening

5    brief, plaintiff argues that defendant cannot "claim" lost profits for the unsold PO 542 bras

6    because defendant's decision not to sell such bras was self-inflicted.  Dkt. 81 at 26.  In

7    response, defendant cited plaintiff's expert's testimony purportedly acknowledging that,

8    when defendant first started receiving notice of the ripped bras from its customer, it had

9    no way to know the extent of defects in the PO 542 bras and needed to perform a risk

10   analysis.  Dkt. 84 at 24.  Defendant also cited Baran's testimony that defendant's

11   decision to quarantine and stop selling the PO 542 was "appropriate and necessary"

12   under industry standards and that, in her opinion, "the high percentage of defects and

13   potential fallout" from those defects would potentially damage defendant's brand.  Id.

14       Aside from contesting the purportedly late disclosure of the additional PO 542 bras

15   at the Greenwood and Fontana facilities, which the court addresses below, plaintiff fails

16   to offer any rebuttal in its reply.  In light of the above, the court denies plaintiff's request

17   for partial summary judgment on defendant's damages theory.

18       **3.    Outstanding Issues Relevant to the Parties' Pretrial Filings**

19       As noted above, the court appreciates plaintiff's position that defendant wrongfully

20   withheld information concerning the additional PO 542 bras maintained at the FedEx

21   facilities in Greenwood and Fontana, Dkt. 88 at 11-13 ("ThirdLove now suddenly claims

22   to be aware of more 'quarantined' bras in Greenwood, Indiana than it made available to

23   Magic Link's expert and principal in November 2019. ***It ought not to be allowed to rely***

24   ***in any respect on hypothetical units from PO 542 it never identified or made***

25   ***available despite multiple request.***") (emphasis added).  The court also understands

26   defendant's response to that charge.  Dkt. 90-1 at 11-12.

27       Plaintiff may bring a motion in limine to preclude defendant from proffering

28   evidence at trial about any portion of the 25,116 remaining PO 542 bras on the basis of

United States District Court
Northern District of California

1   any wrongful nondisclosure during discovery.  However, such purported failure does not

2   prevent the court from making a simple calculation on the basis of the evidence provided

3   that the sum of the unsold remaining PO 542 bras, albeit in quarantine or defendant's

4   inventory, is 25,116.

5         **4.      Motions to Seal**

6         In support of its motion, plaintiff lodged multiple exhibits under seal that defendant

7   deemed "confidential."  Dkt. 79; Dkt. 80.  In its seemingly duplicative administrative

8   motions to seal such exhibits, plaintiff took the position that the lodged exhibits were not

9   truly confidential.  Id.  In response, defendant provided a declaration requesting that the

10  court seal only Exhibit Y to the Hecker Declaration ("Exhibit Y").  Dkt. 85.  In it, defendant

11  explained that that exhibit reflects sensitive financial information, including profit margins,

12  costs, and sales for certain products.  Id.  Defendant further testified that it keeps such

13  information confidential and, if that information were disclosed, such disclosure could

14  deprive it of certain competitive advantages.  Id.  In its proposed order submitted with its

15  declaration, defendant acknowledged that the court should deny sealing all exhibits,

16  except Exhibit Y.  Dkt. 85-1.

17        Cited above by the court, Exhibit Y details defendant's supplemental interrogatory

18  responses.  Based on its review of that document, the court concludes that compelling

19  reasons exist to protect the confidential business information identified by defendant.  Ctr.

20  for Auto Safety v. Chrysler Grp., LLC, 809 F.3d 1092 (9th Cir. 2016).  As a result, the

21  court **DENIES** plaintiff's motions to seal all exhibits to those motions, except Exhibit Y

22  (Dkt. 80-25), and **GRANTS** those motions with respect to only Exhibit Y.

23                                      **CONCLUSION**

24        For the foregoing reasons, the court **GRANTS IN PART** and **DENIES IN PART**

25  plaintiff's motion for partial summary judgment as to its claims and summary judgment as

26  to defendant's counterclaims.

27

28

United States District Court
Northern District of California

1    **IT IS SO ORDERED.**

2    Dated: April 22, 2020

3                                                        /s/ Phyllis J. Hamilton
                                                       PHYLLIS J. HAMILTON
4                                                      United States District Judge